UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

Donald Kaverta, Jaison Zello,
and Cammy Keener,

Case No. 2:21-cv-1883

Plaintiffs,

v.

General Carbide Corporation, and
Michael Wampler,

Defendants,

**PLAINTIFFS' COMPLAINT**

Now comes the Plaintiffs Donald Kavarta, Jaison Zello, and Cammy Keener who file the within complaint verses General Carbide Corporation and Michael Wampler and in support thereof avers the following:

1)  Jurisdiction of this Court is invoked under **28 USC §1331**. This action is authorized and instituted according to **Title VII of the Civil Rights Act of 1964**, as amended (referred to as "Title VII"). Plaintiffs invoke this Court's pendent jurisdiction as to the common laws of the State of Pennsylvania.

2)  In addition this action is authorized according to the basis of age in violation of the Age Discrimination in Employment Act, **29 U.S.C.A. § 623(a)** as if the Defendant is not enjoined, Plaintiffs will continue to be subjected to discrimination.

3)  This Court also has subject-matter jurisdiction of this complaint pursuant to the **Declaratory Judgment Act, 28 U.S.C.A. § 2201**.

**4)** Venue is appropriate and proper in the Federal District Court for the Western District of Pennsylvania under **28 USC 1391(b)(2)** because the events made the basis of this suit occurred in Greensburg, Westmoreland County, Pennsylvania.

**5)** The Plaintiff is Donald Kavarta, hereinafter Plaintiff 1 who was an employee of General Carbide Corporation beginning on or about February 2005.

**6)** Plaintiff 1 is of a protective class, was at least sixty years old or older at all times set forth in this complaint.

**7)** Jaison Zello, Plaintiff 2, hereinafter Plaintiff 2, was an employee of General Carbide Corporation beginning on or about January 2019.

**8)** Plaintiff 2 is of a protective class because his wife is an African American female.

**9)** Cammy Keener, hereinafter referred to as Plaintiff 3 is a competent adult residing in Pennsylvania.

**10)** Plaintiff 3 is of a protective class because she sexually orients as a gay female.

**11)** The Defendant General Carbide Corporation, hereinafter General, is a corporation with its principal place of business in Greensburg Pennsylvania.

12) General is in the business of manufacturing powdered metal parts for tooling, ammunition dyes, roofing molds, medical equipment parts, automobile racing parts, metal punches and dyes.

13) General operates four plants in Westmoreland County, Pennsylvania.

14) Of these four plants three shifts are run continuously to make the various products described in averment 12. .

15) The plant where Plaintiff 1, Plaintiff 2, and Plaintiff 3 worked at the time the discriminatory action occurred was known as Plant 3 and it was managed by Brian Linderman. D

16) Defendant Michael Wampler, hereinafter Wampler or Mr. Wampler, was the shift supervisor for the second shift under which Plaintiffs 1, 2 and 3 worked.

17) At all times relevant to this complaint General and its employees, supervisors, and managers including and not limited to second shift manager Michael Wampler were aware of Plaintiff 3's sexual orientation, and the race of Plaintiff 2's wife, and the age and underlying medical problems of Plaintiff 1.

**FACTUAL BACKGROUND PLAINTIFF 1 JOB DUTIES AND ACTIVITIES**

18) As a machine operator programmer you clean the workplace, organize and program jobs, set up jobs, 1st piece inspection, complete work and job traveler, remake jobs that were made wrong on 1st shift, saw and grind material when needed, work at different machines, blow

off pieces-inspection, machine maintenance, keep grades of powder in proper graded cans, sweep powder off of shop floor, clean Torit (dust collector), stand for 10 hours with no talking, help other HAAS operators, clean powder out of machine to reduce contamination, read and interpret drawings and blueprints, log in and out of jobs.

19) This job involved crouching, handling large objects, write, type, or handle small objects and reaching all day and lifting more than 100 pounds.

20) The position was a highly skilled position which Plaintiff 1 trained himself to do over the fifteen years Plaintiff 1 worked for the Defendant.

21) Plaintiff 1 through his experience was able to train other employees to use the same equipment he used to complete his job tasks.

22) Employee reviews were to be done every year on the employee's anniversary date, but they would only be done sporadically.

23) Plaintiff would need to ask repeatedly for reviews to be done

24) At the direction of Brian Linderman, on around the end of 2018 the review process changed as management would have employees review their own performance and then management would comment on the employee review

25) When reviewing his own performance Plaintiff would rate himself above average due to the fact that he was very careful about checking

measurements and made few mistakes

26) Management would generally agree that Plaintiff's performance was average and did not criticize his performance or productivity.

27) Plaintiff 1 also takes a diuretic among other medicine which caused him to go to the bathroom at a greater frequency than the other employees.

28) Defendant Wampler would repeatedly harass Plaintiff 1 during these bathroom breaks and repeatedly ask if he was done and otherwise harass him to return to his position on the floor.

29) Despite these frequent bathroom breaks Plaintiff 1 was able to complete his assigned work timely without errors or mistakes.

30) On June 11, 2020, Plaintiff 1 was unexpectedly terminated from his employment.

31) Officials told Plaintiff 1 that he was being laid off with no call back because of lack of work or not enough work to keep Plaintiff 1 busy.

32) Despite asserting a lack of work, on June 21, 2020, General Carbide placed a job posting on **Indeed.com** advertising for jobs that were immediately available on their 2nd and 3rd shifts which were the shifts Plaintiff 1 worked.

33) Furthermore, in an October 10, 2020, article in the Tribune Review General Carbide's owner Mona Pappafava reported that the Federal Paycheck Protection Program, helped her keep the company's 250

workers on the payroll. Ms. Pappafava also stated the program allowed her to keep her skilled employees.

34) On November 1, 2020, General Carbide advertised for immediate job openings in the Tribune Review on Plaintiff's shift.

35) While the company laid off Plaintiff, they kept other younger less experienced employees and employees who specifically requested to be laid off

36) These actions make evident that General Carbide used these "layoffs" to divest themselves of older and more experienced employees and hire younger and less experienced employees whom they could pay less.

37) Plaintiff then filed a timely complaint at the Equal Employment Opportunity Commission, EEOC.

38) Later after his complaint was lodged with the EEOC, Plaintiff was informed that he was not fired because of a lack of work, but rather fired in a reduction in staff due to a points system.

39) In this EEOC complaint General Carbide mentioned a point system where it gave each employee a score based on productivity, scrap, attendance, attitude, safety, and other categories.

40) It is notable that the employees of General Carbide were not informed of this point system previously. This failure to inform the employees of a "point system" is further evidence that this point system was generated later to provide justification for Plaintiff's termination.

41)  When classifying Plaintiff according to this system it was stated that Plaintiff "calls off" and "displays poor attitude."

42)  Plaintiff admitted to using vacation days to take his friend's wife to medical appointments so his friend would not get fired. Mr. Wampler told Plaintiff he was proud of him for doing this.

43)  Plaintiff denies displaying "poor attitude" but acknowledges he would question the employer's ethics

44)  Other employees would save jobs for Plaintiff because he would be able to finish the job faster. More experienced employees came to Plaintiff for help with their job tasks. Plaintiff also had to correct jobs higher paid lathe Haas operators made on first shift that they did wrong.

45) Plaintiff stopped setting up jobs for people because no one ever did it for him and/or when he did do it the employee would remove what he did and put another job there.

46) The fact that Plaintiff was employed by General Carbide for over 15 years undermines the employer's allegations of poor performance

## FACTUAL BACKGROUND PLAINTIFF 2 JOB DUTIES AND ACTIVITIES

47) The Plaintiffs reavers and incorporates herein the prior paragraphs.

48)  Plaintiff 2 had no assigned job at General Carbide and worked 1st shift for training for two months and then was moved to 2nd shift in March 2019

**49)** Plaintiff 2 was attempting to secure a position as a grinder but was unable to do so. General Carbide would frequently advertise for this position, hire other individuals for this job who would then quit shortly after being hired.

**50)** Despite their inability to secure permanent employees at this position, General Carbide would not assign this job to Plaintiff 2

**51)** On June 11, 2020, Plaintiff 2 was laid off from his job at General Carbide.

**52)** General Carbide asserts that Plaintiff 2 was laid off due to reduced sales from COVID-19 and due to lack of work.

**53)** Despite asserting a lack of work, on June 21, 2020, General Carbide placed a job posting on **Indeed.com** advertising for jobs that were immediately available on their 2nd and 3rd shift.

**54)** Furthermore, in an October 10, 2020, article in the Tribune Review General Carbide's owner Mona Pappafava reported that the Federal Paycheck Protection Program, helped her keep the company's 250 workers on the payroll. Ms. Pappafava also stated the program allowed her to keep her skilled employees.

**55)** Again, on November 1, 2020, General Carbide advertised for immediate job openings in the Tribune Review on Plaintiff 2's shift.

**56)** While the company laid off Plaintiff 2, they kept other less experienced employees, employees who frequently called off work and employees who specifically requested to be laid off.

**57)** Plaintiff 2 was able to do multiple jobs such as grinding, running lathes, saw operator, and CNC machines, while another employee, Clyde, who is still employed at General Carbide, could only do one job, and refused to move to other stations to do more work.

**58)** Plaintiff 2 was willing to learn whatever he was taught.

**59)** In addition, General Carbide states that Plaintiff 2 had limited skill and not a great attitude

**60)** No further explanation of these remarks or that Plaintiff 2 received any write ups or complaints about his performance or attitude prior to his employment being terminated.

**61)** General Carbide also mentioned the use of a point system being used in their termination of Plaintiff 2's employment

**62)** It is notable that the employees of General Carbide were not informed of this point system previously. This failure to inform the employees of a "point system" is further evidence that this point system was generated later to provide justification for Plaintiff 2's termination.

**63)** Plaintiff 2 believes his termination was the result of retaliation due to race or due to a hostile working environment due to race.

**64)** Plaintiff 2's supervisor Mike Wampler would frequently make racist statements

**65)** At the July 20, 2019, company picnic, Plaintiff 2 introduced his family to Mr. Wampler in an attempt to avoid further racist remarks or harassment.

**66)** However, this effort was unsuccessful because after Mr. Wampler discovered Plaintiff 2 had a black wife and children he increased his use of racial slurs, particularly against Plaintiff 2.

**67)** There were two nooses hanging in the Plant 3 workplace, one by the saw at 2 mic and the other in 3 mic by a grinder. Plaintiff 2 has pictures of these nooses.

**68)** In Plant Number 1 an employee drew Swastikas twice in a public area, yet this person was not fired.

**69)** Plaintiff 2 is not alleging that the nooses or Swastikas were placed specifically to harass him; rather it is evidence that General Carbide tolerates racism and is a hostile work environment for race.

**70)** It is also significant that there are only two black employees out of the approximately 250 individuals employed by General Carbide.

**71)** On or around November 14, 2019, there was a football game on at work being watched by Mr. Wampler. Plaintiff 2 came up to Mr. Wampler with a question about a blueprint and another employee asked who the penalty was on in the football game.

**72)** Mr. Wampler said, "some n****r" and Plaintiff 2 walked away.

**73)** The confrontation was purportedly witnessed by Arthur Little and Plaintiff 1.

74) Mr. Wampler would constantly say things to Plaintiff 2 like "Ray Ray" and "Leroy" as an insult to black people and an insult to Plaintiff 2.

75) Mr. Wampler stated that the plant manager was treating him like a black stepchild.

76) When complaining about carts at work, Mr. Wampler referred to them as "African American technology"

77) The actions of Wampler including the use of the racial epithets regularly occurred in front of staff and was open and notorious to the other employees of General Carbide.

78) Plaintiff 2 was on medical leave from work from March 6, 2020 to March 23, 2020.

79) While Plaintiff 2 was on leave, another employee Cammy Keener, Plaintiff 3, informed him that Mike Wampler said "Jaison is in the hospital and caught corona virus from his n****r family"

80) Plaintiff 2 went back to work on or about March 23, 2020, and another employee left work early due to a fever. Plaintiff 2 asked HR if it was safe for him to be at work.

81) At that time Plaintiff 2 met with Human Resources Kathleen Green.

82) The genesis of the meeting was the company physician allegedly cleared Plaintiff 2 to return to work, but Plaintiff never saw the company physician.

83) In this meeting Plaintiff 2 stated that he was being belittled by a racist supervisor and he reported the incidents and racist remarks.

84) The meeting devolved into an argument.

85) In the argument Plaintiff 2 stated that Plaintiff 1, Plaintiff 3, and Arthur Little could corroborate his allegations.

86) Mr. Wampler then either was called in to Human Resources or entered room or hallway with Plaintiff 2 and Kathleen Green to speak to the HR manager. Mr. Wampler said Plaintiff 2 was lying despite multiple employees hearing the racist things he said. Mr. Wampler referred to Plaintiff 2 as a "f***ing liar." Plaintiff 2 was told to leave

87) Plaintiff 2 then went to AGH Hempfield and was transferred to Forbes Hospital and was inpatient there for a week with illness.

88) While Plaintiff 2 was in the hospital, Ms. Green the HR manager called to tell him that Mike Wampler was "suspended" for three days.

89) Plaintiff 2 asked "is that enough?"

90) Ms. Green claimed that no one directly heard what Mr. Wampler said and that it was hearsay.

91) It was never explained whether Mr. Wampler was suspended or if he took three vacation days.

92)  Plaintiff 2 asked if there was another place in the plant, he could work so he would not be exposed to powder due to his lung condition. Plaintiff 2 was told there was nothing available.

93).  Plaintiff 2 asked how he would be able to work with Mr. Wampler. HR insisted that Plaintiff 2 had to work with him

94)  Plaintiff 2 asked plant manager Brian Linderman if there was another place he could work, such as plant 1. Mr. Linderman informed Plaintiff 2 that there was nothing else available. Plaintiff 2 again asked about how he would be able to work with Mr. Wampler after all his racial slurs. Mr. Linderman indicated that they would have to work together.

95)  On June 11, 2020, Plaintiff 2 was laid off after a second confrontation with Kathleen Green.

96)  Plaintiff 3 and Plaintiff 1 who also witnessed the racial slurs were thereafter laid off at the end of their shifts.

97)  Plaintiff 2 lost his job due the racial discrimination; any argument to the contrary is a mere pretext.

## FACTUAL BACKGROUND PLAINTIFF 3 JOB DUTIES AND ACTIVITIES

98) The Plaintiffs re-aver and incorporate herein the prior paragraphs.

99) Plaintiff 3 was hired by General Carbide on or about April 2013 as a programming machinist to work the 6-2 shift at plant 1.

100)      After approximately one and a half years Plaintiff 3 was transferred to plant 3 for the 2-10 shift.

101)     Specifically, Plaintiff 3 was to work in an area of the plant called Near Net.

102)     The Near Net contained multiple C&C and manual machines.

103)     Plaintiff 3 was then trained to run multiple C&C machines and manual machines.

104)     General trained Plaintiff 3 and she was able to program all machines within the Near Net, was able to do green inspection and final inspection.

105)     Plaintiff received quarterly bonuses when she worked in Near Net due to accuracy, she received Christmas Bonuses, Thanksgiving bonuses, and bonuses for perfect attendance.

106)     As of her past performance review Plaintiff received a 4% raise in pay, while other similar workers only received a 3% raise in pay.

107)     Approximately during 2017 and due to a rash of retirements and people quitting, Plaintiff started working in green inspection for portions of her shift due to a lack of workers.

108)     Plaintiff 3 while in green inspection encountered Mike Wampler the shift supervisor.

109)     Mr. Wampler had less seniority than Plaintiff 3, and Plaintiff 3 had more skills than Mike Wampler.

110)     When she encountered Mr. Wampler, Mr. Wampler would make comments to both Plaintiff 3 and other co-workers and leads about both her gender and sexual orientation such as:

a. At one point the workers received a $25 gift certificate from Dicks sporting goods, but Plaintiff 3 did not receive one because according to Mr. Wampler, Plaintiff 3 did not like "dicks."

b. Mr. Wampler would belittle Plaintiff 3 calling her dumb dyke and or dumb bitch, gay bitch, bull-dyke.

c. Called Kathleen Green iron-box and Nazi

111)     Plaintiff 3 would regularly tell her leads, Linda Newhouse and Terri, another supervisor, of her displeasure of Mr. Wampler's comments.

112)     A meeting between Plaintiff 3 and Mr. Linderman regarding unpaid sick leave occurred on February 3, 2020, where Mr. Linderman confronted Ms. Keener regarding the reason for the leave.

113)     The meeting occurred in the closed shipping office.

114)     The genesis of the meeting was a job that sat through the weekend and was not completed timely over the weekend.

115)     When Ms. Keener informed him that she took the leave due to female problems, Mr. Linderman stated "do you think you can do whatever you want because you are gay?" Mr. Linderman then kicked the garbage can trying to get a rise out of Plaintiff 3

116)     Mr. Linderman believed that Plaintiff 3 requested the leave due having a game night with her family and friends rather than a medical issue. Plaintiff 3 denied the game night allegation.

117)     Plaintiff 3 then requested to return to work and was able to return to work.

118)     Throughout these times Plaintiff 3 begged for a transferred to another plant or shift in order to be away from Mr. Wampler, but the supervisors and human relations personnel refused.

119)     On March 26, 2020, there was a meeting between Brian Linderman and Plaintiff 3.

120)     Mr. Linderman offered Plaintiff 3 overtime if she would come in for the meeting.

121)     The meeting occurred between Plaintiff 3 and Brian Linderman and Kathleen Green.

122)     In this meeting Plaintiff 3 told her supervisors about the racial and gay slurs.

123)     During this meeting Brian Linderman promised to protect Plaintiff 3 and Plaintiff 3 again requested to be moved to a different plant or different shift.

124)     Both Linderman and Green rebuffed Plaintiff 3's request but promised to do a thorough investigation.

125)     On March 26, 2020, Human Relations thirty minutes after the meeting, informed second shift that Defendant Wampler was suspended for three days.

126)     However, when Mr. Wampler returned from the suspension, he would continue the racist and homophobic behavior and slurs.

127)     For example, he would call the people protesting for Black Lives Matter n#@$%^&. These additional racial and homophobic comments were open and notorious to other workers and personnel.

128)     After the three-day suspension Mr. Wampler would interfere with Plaintiff 3 and her ability to complete work because he refused to provide Plaintiff 3 with tools or proper Personal protective gear.

129)     On other occasions and after the three days suspension Mr. Wampler would intentionally or recklessly and needlessly run a cart into the Plaintiff back and ankles causing her pain.

## COUNT 1
## PLAINTIFF 2 VERSES GENERAL
## HOSTILE WORK ENVIRONMENT FOR RACE

130)     Plaintiff 2 reavers and incorporates herein the prior paragraphs.

131)     Defendants' actions and inactions created a hostile work environment for race as defined by the Courts construing Title VII.

132)     The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and received the Notice of Right to Sue.

133) All prerequisites to the filing of this suit have been met, including the exhaustion of all administrative remedies.

134) Plaintiffs have incurred expenses including, but not limited to reasonable attorney's fees because of the facts alleged.

135) The effect of the policies and practices pursued by the Defendants as alleged above has been and continues to limit, classify, and discriminate against the Plaintiff 2 in ways which caused her termination and/or otherwise deprived him of other employment opportunities and otherwise adversely affect his status as an employee because of race.

136) As the result of the termination of his employment due to race, Plaintiff 2 was humiliated, embarrassed, and suffered mental anguish as the result of the adverse employment action taken by Defendant General Carbide.

137) As the result of his termination Plaintiff 2 lost wages, as ascertainable amount of money

138) General Carbide Corporation violated the **Title VII** and will continue to violate the **Title VII** if not enjoined, because it maintains policies, programs, and classifications that impermissibly discriminate on the basis of race.

139) Accordingly, Defendant General Carbide Corporation took personnel actions in violation the purposes of the **Title VII** that workers be free from any discrimination based on race.

140)     The Actions of General Carbide were calculated, intentional, and outrageous such that punitive, exemplary, and other damages as permitted by law are applicable.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment for Plaintiff and award the following relief:

(a) A permanent injunction prohibiting General Carbide its employees, agents, officers, representatives, and servants from discriminating on the basis of race to make hiring, promotion, termination, and other employment decisions;

(b) A declaratory judgment that Defendant General Carbide violated, and are violating, Plaintiff's rights under the **Title VII;**

(c)     humiliation and mental anguish damages;

(d) pre- and post-judgment interest at the legal rate;

(e) Money damages in an amount to be determined after trial and

(f) An award to Plaintiff for attorney's fees and costs of suit; and

(g) punitive or special damages as permitted by law and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

**COUNT 2**
**PLAINTIFF 3 VERSES GENERAL**
**HOSTILE WORK ENVIRONMENT FOR SEXUAL ORIENTATION/GENDER**

141)   Plaintiff 3 re-avers and incorporates herein the prior paragraph.

142)     Defendants' actions and inactions have created a hostile work environment for Sexual orientation/gender as defined by the Courts construing **Title VII.**

143) The effect of the policies and practices pursued by the Defendants as alleged above has been and continues to limit, classify, and discriminate against the Plaintiff in ways which jeopardized her job, deprive her of other employment opportunities, caused her termination, and otherwise adversely affect their status as employees because of her gender/sexual orientation.

144) As the result of the termination of his employment due to sexual orientation/gender, Plaintiff 3 was humiliated, embarrassed, and suffered mental anguish as the result of the adverse employment action taken by Defendant General Carbide.

145) As the result of his termination Plaintiff 3 lost wages, as an ascertainable amount of money.

146) The actions of General Carbide were calculated, intentional, and outrageous such that punitive, exemplary, and other damages as permitted by law are applicable.

147) Plaintiff 3 filed a charge of discrimination with the Equal Employment Opportunity Commission and received the Notice of Right to Sue.

148) All prerequisites to the filing of this suit have been met, including the exhaustion of all administrative remedies.

149) Plaintiffs have incurred expenses including, but not limited to reasonable attorney's fees because of the facts alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment for Plaintiff and award the following relief:

(a) A permanent injunction prohibiting General Carbide its employees, agents, officers, representatives, and servants from discriminating on the basis of age to make hiring, promotion, termination, and other employment decisions;

(b) A declaratory judgment that Defendant General Carbide and violated, and are violating, Plaintiff's rights under the ADEA;

(c) humiliation and mental anguish damages;

(d) pre- and post-judgment interest at the legal rate;

(e) Money damages in an amount to be determined after trial and

(f) An award to Plaintiff for attorney's fees and costs of suit; and

(g) punitive or special damages as permitted by law and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

## COUNT 3
## PLAINTIFF 1 VERSE GENERAL CARBIDE CORPORATION
## AGE DISCRIMINATION

150) Plaintiff 1 re-avers and incorporates herein the prior paragraph.

151) Plaintiff avers that the harassment he suffered while employed by the Defendant General Carbide was due to his age.

152) Plaintiff further avers that General Carbide Corporation terminated his employment because of his age.

153) As the result of the termination of his employment due to age, Plaintiff 1 was humiliated, embarrassed, and suffered mental

anguish as the result of the adverse employment action taken by Defendant General Carbide.

154)    As the result of his termination Plaintiff 1 lost wages, as ascertainable amount of money

155)    General Carbide Corporation violated the ADEA and will continue to violate the ADEA if not enjoined, because it maintains policies, programs, and classifications that impermissibly discriminate on the basis of age.

156)    Accordingly, Defendant General Carbide Corporation took personnel actions in violation the purposes of the ADEA that workers be free from any discrimination based on age.

157)    The actions of General Carbide were calculated, intentional, and outrageous such that punitive, exemplary, and other damages as permitted by law are applicable.

158)    Plaintiff 1 filed a charge of discrimination with the Equal Employment Opportunity Commission and received the Notice of Right to Sue.

159)    All prerequisites to the filing of this suit have been met, including the exhaustion of all administrative remedies.

160)    Plaintiffs have incurred expenses including, but not limited to reasonable attorney's fees because of the facts alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment for Plaintiff and award the following relief:

(a) A permanent injunction prohibiting General Carbide its employees, agents, officers, representatives, and servants from discriminating on the basis of age to make hiring, promotion, termination, and other employment decisions;

(b) A declaratory judgment that Defendant General Carbide and violated, and are violating, Plaintiff's rights under the ADEA;

(c)    humiliation and mental anguish damages;

(d) pre- and post-judgment interest at the legal rate;

(e) Money damages in an amount to be determined after trial and

(f) An award to Plaintiff for attorney's fees and costs of suit; and

(g) punitive or special damages as permitted by law and such other and further relief, both general and special, at law and in equity, to which Plaintiff is justly entitled.

## COUNT 4
## PLAINTIFFS 1, 2, 3 VERSES GENERAL
## RETALIATORY TERMINATION

161)    Plaintiffs 1, 2, and 3 re-avers and incorporates herein the prior paragraphs.

162)    All three Plaintiffs participated into the investigation of shift supervisor Wampler and all three Plaintiffs made statements to Human Resources about Mr. Wampler's harassing behavior whether it was due to race, sexual orientation/gender, or age.

163)    All three Plaintiffs protested the harassment by Mr. Wampler to their appropriate supervisors and human relations.

164) All three Plaintiffs took part in some way or another into the investigation concerning Mr. Wampler and his racist, misogynistic, homophobic, and agist manners and slurs he consistently made.

165) These actions were protected under **Title VII.**

166) In violation of each Plaintiff's rights under and as a direct result of each Plaintiff participating in the investigation of Mike Wampler or making complaints concerning Mr. Wampler's behavior Defendant General Carbide terminated all three Plaintiffs in violation of their rights protected under **42 U.S.C.A. § 2000e-16(a).**

167) The actions of General Carbide were calculated, intentional, and outrageous such that punitive, exemplary, and other damages as permitted by law are applicable.

168) Plaintiff 1 filed a charge of discrimination with the Equal Employment Opportunity Commission and received the Notice of Right to Sue.

169) All prerequisites to the filing of this suit have been met, including the exhaustion of all administrative remedies.

170) Plaintiffs have incurred expenses including, but not limited to reasonable attorney's fees because of the facts alleged.

171) As the result of his termination all three Plaintiffs lost wages, as ascertainable amount of money

**172)**      All three Plaintiffs' remedies at law are inadequate and, unless enjoined, the acts by Defendant and Defendant's agents will continue to cause irreparable harm to the Plaintiffs and their reputation.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment for Plaintiff and award the following relief:

(a) A permanent injunction prohibiting General Carbide its employees, agents, officers, representatives, and servants from discriminating on the basis of age, race, gender, or sexual orientation, to make hiring, promotion, termination, and other employment decisions;

(b) A declaratory judgment that Defendant General Carbide and violated, and are violating, Plaintiff's rights under the ADEA and Title VII when it terminated Plaintiffs 1, 2, and 3;

(c)      humiliation and mental anguish damages for all Plaintiffs;

(d) pre- and post-judgment interest at the legal rate;

(e) Money damages in an amount to be determined after trial and

(f) An award to all Plaintiffs for attorney's fees and costs of suit; and

(g) An award of punitive or special damages as permitted by law and such other and further relief, both general and special, at law and in equity, to which all Plaintiffs are justly entitled.

**COUNT 5**
**BATTERY**
**PLAINTIFF 3 VERSES MICHAEL WAMPLER**

173)    Plaintiff 3 reavers and incorporates herein the prior paragraphs.

174)    The actions of Mr. Wampler ramming the cart into Plaintiff 3's back and ankles as heretofore described in the complaint constitute a battery of the Plaintiff by Defendant Wampler.

175)    Defendant Wampler did these acts intentionally with the intention of causing painful contact with the Plaintiff 3.

176)    The actions of  Mr. Wampler caused Plaintiff 3 pain and were an unwanted and unwarranted touching of her person.

177)    The intentional and wanton actions of Mr. Wampler were outrageous as they were the result of Mr. Wampler's homophobia and because it is believed, and averred Mr. Wampler knew or had reason to know Plaintiff 3 complained of his unrepentant and unrelenting homophobia and participated in the investigation into his racism.

178)    These actions by Defendant Wampler caused the Plaintiff 3 humiliation and great mental anguish.

WHEREFORE, Plaintiff 3 demands that Defendant Wampler be cited to appear in this action, and that after trial by jury, a judgment be entered granting Plaintiff the following:

A. actual damages;

B. punitive damages;

C. mental anguish damages;

D. pre- and post-judgment interest at the legal rate;

E. reasonable attorney's fees and costs of Court; and

F. such other and further relief, both general and special, at law and in equity, to which

Plaintiff is justly entitled.

**A JURY TRIAL IS DEMANDED ON ALL APPLICABLE COUNTS.**

Respectfully Submitted,

/s/David A. Colecchia, Esquire
David A. Colecchia, Esquire
PA.I.D.No. 71830

David A. Colecchia and Associates
LAW CARE
324 South Maple Ave.
Greensburg, PA 15601

(724)-837-2320
(724)-837-0602(fax)

colecchia542@comcast.net